Good morning. My name is Ellen Durkee from the U.S. Department of Justice. I represent the Bureau of Land Management, or BLM. You can stand back just a second. Okay, thank you. And I'm going to try to save some of the time for my co-counsel, Mr. Horngren, who represents the intervener defendants. You have 20 minutes total, and that also includes any reserved time for rebuttal, so keep that in mind. This Court should reverse the District Court's judgment holding that area and research area salvage component of the Timbered Rock Project is not in conformity with plan requirements and thus violates the Federal Land Policy and Management Act. Today, I will focus primarily on whether the project meets Northwest Forest Plan standards and guidelines respecting salvage on late successional reserves, and in particular whether it meets standards and guidelines concerning retention of snags that are likely to persist until late successional conditions return. And for simplicity of expression, I'm going to refer to those as large snags instead of saying each time snags that are likely to persist. Before turning to the legal issues, I just want to go back and review the context in which the salvage occurs. The late successional reserves were established to provide late successional habitat for species that need that. The areas that are going to be salvaged in this project prior to the fire were in late seral condition, but after the fire, they are no longer in late successional habitat. The only areas that would be salvaged burned with high to moderate severity, and that is basically a complete burnout. For example, with high severity, it kills 90% of the vegetation, and there's less than 10% canopy covered. So what we're talking about is areas that are simply now dead, burned trees and grass, basically. These areas that we're talking about are not late successional habitat. And therefore, when we look to think in terms of are we negatively impacting late successional habitat conditions, we are not because it's not in that condition in the areas that we're talking about salvaging. The Northwest Forest Plan recommends a conservative quantity of salvage under the standards, and there's different ways to look at conservative, how conservative quantities are here, but I'd just like to kind of remind the court that we're not talking about a great deal of salvage here. Well, give us some sort of point of reference. You say conservative. What, 25%? Did I see that number? When you say conservative, what do you mean? What's the context of it? Well, the kinds of figures that I can give you that I would say indicate it's conservative is that salvage would occur on only 8% of BLM land in the fire parameter area. It's occurring on less than 1% of the watershed area. They're retaining 86% of the fire-killed trees, and that includes retention of over two-thirds of snags, that is dead trees that are over 8 to 10 inches, but dead trees in the large classes. That means, you know, in the 16 inch, over 20 inch, in all categories, all the way up. So that's why I say there's a great deal of retention of snags here, because what happens when you do this fire is that you have an overabundance of snags, and so you have a great deal of density of snags, and so they're taking out some. Between the research and area salvage, we're talking about 961 acres, which is actually a fairly small amount when you consider that the fire perimeter area was 12,000 acres of BLM administered land, and the watershed as a whole is about 35,000 acres. Well, let me see if I understand. The Northwest Forest Plan requires, as I understand it, the Bureau of Land Management to focus on maintaining the snag population, unless there are good reasons not to. So I guess my question is whether or not there's been any substantial showing that there are specific good reasons not to focus on retaining large quantities of the snag population. Well, first of all, focus on doesn't mean you retain all of them. No, it says unless there are good reasons not to, but to focus on, as I understand it, maintaining as much snag population as possible, unless there are good reasons not to do so. Is that correct, or am I incorrect? With all due deference, I think I would disagree. I will answer your question about the good reasons, but then I'd like to continue and say, well, I think that that paraphrase of the Northwest Forest Plan is not correct. But let me try to answer the question that's really asked first. The good reasons why this is not violative, the standards and guidelines for the Northwest Forest Plan, are these. The removal of salvage in this quantity does not cause any negative effects on late successional habitat. And if you look at the standard guidelines, what it says is these standards and guidelines are intended to prevent negative impacts on late successional habitats while allowing commercial removal of wood volume. Secondly, it does not impede development of late successional conditions in these areas. What is going to have to happen for late successional conditions to come to these areas is you're going to have to have trees grow up from having none there at this point in time. Finally... Now, you say that you retain two-thirds of the snags. Did I understand you correctly when you said that? In the larger quantities, in the fire perimeter area. All right. And put it in context from the standpoint of the issue here, opposing counsel feels that that's not enough, that a higher percentage should have been retained. Right. So we're talking about, what, two-thirds to something less than 100, presumably. Right. Well, actually, I think that... Let me switch to what I think is important for the court to understand. What's at issue, what the legal question here is at issue. I think it's a little different than the case that you heard on Monday. Because the fifth claim in their complaint is what we're talking about here. And what that fifth claim in their complaint said, it's purported to quote from the Northwest Forest Plan. It underlines and it says, you must retain all snags. In quotations, saying that's what the Northwest Forest Plan, you won't find those words, retain all snags. The district court then made that ruling, and that is really a lot of what propels the government to appeal this case. The district court says that the Northwest Forest Plan affirmatively requires retention of all large snags, all snags that are likely to persist. And that is the fundamental first legal issue this court has to answer. Was the district court correct in that? And we submit it is not. You look at the plain language of the Northwest Forest Plan, and it nowhere says that. And on that issue, the deference issue works like that. That's a strictly legal issue, interpreting the language of the Northwest Forest Plan. And if the plain language of the plan actually said that, then, of course, that would be controlling. But the language doesn't say that. Now, correct me if I'm wrong, in Excerpt of Records 1621, the Northwest Forest Plan places a general priority on snag retention, does it not? Well, I don't actually see the word general priority. What it talks about is that should that management plan, a stand-replacement bench be designed to accelerate or not impede development of lake habitat conditions. It says, because there's much to learn about development of species associated with this forest and their habitat, it seems prudent to only allow removal of conservative quantities of salvaged material and retain management opportunities until the process is better understood. And then in, you know, guideline number three, it says, following stand-replacement disturbance, management should focus on retaining snags that are likely to persist. So that was the language, I think, that I was referring to. Okay. Well, then I think, as I said, the first issue, I think, for this Court, the legal issue is, does that mean you have to, you know, retain all snags, which was their claim and was which of the district court rules. All right. Then I think we get to the issue that Judge O'Scanlan raised, which is assuming the Court agrees with the United States that it doesn't say or mean you retain all snags. What level of snag retention do you have to have? Don't you also go to other property within the overall forest plan and looking at, say the National Forest Plan prioritizes the environmental conditions, are there other sites good enough for research logging here? Okay. On the research standards and guidelines, what it says is that as long as it's consistent with the standards and guidelines, with the objectives of the National Forest Plan, those conditions that you're talking about, doing research in other areas, do not apply. And the district court agreed with us on that. So you only go to that if you first conclude that it doesn't meet the standard guidelines. All right. The district court said, well, because I already ruled you have to retain all snags, of course, you know, you have to get to the fallback conditions. I'm suggesting you don't have to get to those fallback conditions. But if you do get to the fallback conditions, you know, the two conditions are that you're testing assumptions, which I think, if anything, this record calls out that more research is needed on what snag levels are appropriate in severely burned areas. And then you get to the one that you mentioned, which is are there opportunities outside the late successional reserves. And what the BLM explained is that the reason, first of all, they've said that anywhere in the Pacific Northwest would be an opportunity. And I think that is a direct sort of contradiction of other complaints they have, which is relying on research that doesn't pertain to this particular province or locality. So there is a need for research within particular regions. But you have to look to the overall plan in focusing on this locality, do you not? Well, actually, one of the things that the Northwest Forest Fund does talk about, right in the salvage guidelines, is how specific guidelines which should be developed by physiographic province. It recognizes you're not going to have an across-the-board snag retention, that you're probably going to make adjustments of how much snag retention is appropriate, depending on the more regional provinces. But what the BLM explained here is that the reason that they thought it needed to be in an LSR, because LSRs are long-term management under certain conditions. If you take it outside of an LSR, you put it in a matrix area, you're going to end up not having these restrictions on timber production, and they think that would then compromise the research. In other words, they're looking for some place where they have these kind of management structures in place. Thank you. In terms of the second sort of issue of, first of all, I question whether this really is an issue, whether they're saying, I think their position, and I apologize if I misstated, is that you have to retain all snags likely to persist. That was their claim in the complaint, page 16, claim 5. But if you go the next step further and say, well, is the amount of snags that are retained in this project reasonable, then I think you're to the level of deference, the sort of typical arbitrary and capricious level of deference, which we're all familiar with under the APA. And you defer to the agency's scientific judgment. In the agency's scientific judgment, the number of snags that they're retaining is sufficient to provide the snags for those snag-dependent species. When we talk about snag-dependent species, I want to make clear, we're not talking about late successional dependent species like the leal. We're talking about primary excavators and so on. And what the BLM did is they went to primarily four different references and said that this level is going to be enough for this population of species. And I see Mr. Horngren is letting me know my time is up, so I will stop there. Good morning. Scott Horngren for the interveners. I'd like to shift gears entirely and focus on the NEPA issues in this case. And my theme today on behalf of interveners is that the data collection requirements for cumulative effects analysis are not unlimited, and that BLM's cumulative effects analysis in the environmental impact statement is not arbitrary and capricious. When evaluated in light of the reasonable boundaries on that analysis, this Court has stated many times that general statements about possible effects are not adequate, but there's at least four qualifications of the general rule, none of which were applied by the district court. First, in Neighbors of Cutty Mountain and many other Ninth Circuit cases, the courts explained that the absence of the information is justified when the agency explains why more detailed data can't be provided. Second, in the Kleppe v. Sierra Club Supreme Court case, the Supreme Court added that practical considerations of feasibility may limit effects analysis. Third, last year in Public Citizens, the Supreme Court held that where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency can't be considered the legal relevant cause of the effect. But what about the requirements of the Lands case? Lands Council v. Powell, which says the analysis must be in sufficient detail to promote an informed assessment of environmental considerations. And I'll get to that in a minute, and it's a good question. I think the other sort of boundary on the analysis, an important boundary, is expressed partly in Public Citizens and partly in the CEQ regulations, where the cumulative, it's explained that the information collection should focus on information essential to a reasoned choice among alternatives. So now with those boundaries in mind, I'd like to address one of the key issues, which was the private land. What's going on, you know, what's happening on private land? Did you adequately assess the cumulative effects together with what's going on on Federal lands? And in this case, on the cumulative effects, I think the Court needs to focus on the context of the decisions BLM was trying to make. Council talked about the late successional reserves and the late successional habitat and how we're treating that. And Lands Council says, well, you need to get information about the late successional habitat in order to make a decision. And what the Timbered Rock EIS explains is that BLM assumed that the private forest land in this area, and it's in a checkerboard pattern, would not have any late successional habitat at all because the stands before the fire were 30 to 80 years old and were not rated suitable habitat because there was no legal requirement to maintain the areas in older forest stages. And we would argue that that's consistent with the public citizen's analysis. The EIS discusses that at record page 438. The EIS went on to say at page 568, record page 568, that the Oregon Department of Forestry on these private lands requires the retention of two snags per acre. And they acknowledged that all the snags weren't going to be saved on private lands, and they made the assumption that two snags would be preserved. In essence, what BLM did here is something that CEQ removed back in the 80s from the CEQ regulations. They did a worst-case analysis. They looked. Now, they didn't go around crawling on the private lands and measuring the trees and that sort of thing. But in terms of the boundaries on the cumulative effects analysis and the issue of, was it essential to a reasoned choice for BLM to determine how many snags they were going to remove on their land? That information was not, and the assumptions that they made in the EIS, we believe, were adequate for the cumulative effects analysis. What's our standard of review with respect to the EIS? The standard of review is, excuse me, arbitrary and capricious standard of review. The NEPA claim is brought under the APA, and that's very clear that it's arbitrary and capricious here. And the sediment reduction issue was another concern. And in that case, BLM handled it this way. Is this the riparian reserves? I'm sorry? Is this the riparian reserves? It's, no, it's more on the cumulative effects and the assessment of what's going on on private lands. And the first issue is what's going on with the forests. And then the next issue is what's going on with the roads. And the roads are important because the EIS identified the fact that the sediment and erosion in this degraded watershed was primarily, 80 percent of the sediment came from roads. A large degree of the sediment was from the existing roads. And so unlike lands counseling, where the agency ignored how they got to the situation they were in, which was a degraded watershed with insect problems and that sort of thing, here BLM went back and they looked. And they identified roads and the number of roads in the riparian zones, roads outside the riparian zones. They concluded that of the total sediment, that 10,000 or 80 percent of it was coming from the roads. They estimated that the private landowners built seven miles of roads, but the design and construction standards weren't known. So BLM couldn't assess the effects of those roads. BLM used this information to decide that they weren't going to build any new permanent roads, that they were going to locate the roads on the ridgetops. Only 4,000 feet of roads that they were going to build out of 630 miles of roads in the area. And BLM concluded by assuming that replacing culverts, decommissioning roads, reducing the road density and closing roads would actually result in a reduction in cumulative effects because those were the things that they analyzed on their property. Actions that they could take to try to reduce the cumulative effects. And lastly, they looked at the harvest systems, whether it's going to be by a helicopter or a tractor or a skyline, and related those to the amount of sediment and soil disturbance that each of those produced to inform them in deciding what sort of logging systems to use and make a choice between these methods, which they didn't do in Lands Council. I'd like to save the balance. Council, unfortunately, you've exceeded your time. I see the 40 seconds. It's still counting negatively, unfortunately. I wish we could design a clock that just stayed at 0, 0, 0, but it keeps counting negatively. Thank you. We will hear now from the appellees. Yes, please, the court. My name is Susan Jane Brown, and I'm representing plaintiffs, appellees in this case, Oregon Natural Resources Council and the other plaintiffs. I think that what I'd like to first do is really make it clear what we're talking about in this case and the nature of the Elk Creek watershed where the flaming rock and smoke gobbler timber sales, which is what we're challenging in this case, are located. We're talking about a watershed that there have been approximately 19,000 acres of timber harvest in the recent past. We're also talking about a watershed that the Bureau of Land Management has put off limits as a deferred watershed from additional logging given the high rate or the examples of cumulative effects that we're seeing in this watershed. So BLM already understands that this area should be off limits to logging. If these were green timber sales, I doubt we would be here because BLM has already decided that we're not going to have any more. When you say off limits to logging, you're saying zero logging? That's my understanding of what a deferred watershed is designed to do. Now, the BLM Resource Management Plan does say that a conservative amount of activity could occur in deferred watershed if there are no additional cumulative effects resulting from that activity, the type of cumulative effects that led to the deferral in the first place. Well, now, let me be sure that we're all on the same wavelength here. Counsel for the government said that this plan represented about an 8% salvage.  It's really unclear that the numbers in the EIS kind of shift around, but it is roughly an 8%. I've seen 12% and 13% in the EIS. So roughly that number of trees would be salvaged under this proposal. All right, and your position is that none of those should have been salvaged, is that correct? That's not correct, actually. Well, you're getting from 8% down to zero. We're really getting very, very narrow here. Right, and I think that there are two responses to that. The first response is this Court's decision, is to look to this Court's decision, in the Pacific Coast Federation of Fishermen's Association's case that's cited in the briefs. In that case, this panel or this Court interpreted whether or not a site-specific project that has, quote, small effects, in fact, can be viewed as having small effects at a larger scale. The idea there is that simply because the BLM characterizes this project as small or conservative, does not necessarily mean that that small and conservative project will have small and conservative effects. And this goes to the nature of the Elk Creek Watershed. The area has been extensively logged and roaded. Boise owns, a private timberland owner, owns every other square mile within the Elk Creek Watershed and has logged it all. There's nothing left there. The BLM acknowledges that 6,000 acres of Boise's holdings were logged after the Timber Rock Fire. So what we're looking at is a watershed that has been extensively managed in the past. And so if you are looking at how this project may or may not affect the resources in that watershed, you have to look at the actual nature of the watershed itself. The nature of the watershed in this case is heavily managed. It's degraded. The BLM has already indicated that it's a deferred watershed, and really we shouldn't be doing anything here. In other words, you're saying that 8% is too much. It should be zero or should it be something a little over zero, but somewhere between 8% down to zero. Well, that's a good question, Your Honor, and I think that there are two ways. I think it helps us get a sense of what this is all about because this is a very deferential statute, is it not? Well, the deference issue is something that I definitely would like to address. Yes. But at least what we're talking about in terms of dispute is the Forest Service thinks that they're being conservative at 8% and you think that that's already too much. It should be something like 2%, 3%, zero, five. Give me a handle here. Sure, and I agree that this is a difficult issue, and I know judges don't want to manage forests, and so we're looking to the agency to guide us in this case. But there are two responses to that. The first response is that the BLM actually considered an alternative that would have been consistent with the late succession reserve assessments guidelines for how to meet the Northwest Forest Plan standards and guidelines, and that was Alternative C. And if you look at the administrative record, the BLM looked at Alternative C, and Alternative C is actually called the LSRA alternative. But the BLM rejected this alternative because it was uneconomical, meaning it would not recover enough commercially valuable trees. And that's another thing to keep in mind in this case. We're not talking about salvaging small diameter trees that have very little wildlife benefit. We're talking about the average diameter of dead tree to be removed in this case is 26 inches in diameter. That's more than two feet. That's a big tree down in southern Oregon, and that's the average size of tree to be removed. Now, counsel tells us that they kept, the BLM kept over two-thirds of those larger trees. Do you disagree with that? I don't necessarily disagree. I think that the issue here is discussing the briefs as the averaging issue, and what BLM is actually doing is, and this is in the record at FEIS page 5-30, and also cited in our briefs, where the BLM says, quote, snag levels would be met in the unharvested areas outside of the salvaged units. So what this means is that, yes, BLM may be retaining some snags. That's understood. The problem is that they aren't retaining those snags within harvest units. And plaintiffs and ONRC in this case has argued that the BLM must meet standards and guidelines within harvest units, not some area outside of harvest units, because those areas aren't being managed. We're leaving those areas alone. And so when the BLM says we're retaining two-thirds of the snags, they're retaining them outside of managed areas, i.e. the actual unit that will be logged. What are they retaining within the harvest units as you look at it? Well, it's unclear, because what the language in the FEIS says is that, well, we're retaining between six and eight snags per acre on average. And so we're not sure how many in units they're actually retaining. From what we can gather from the citations in the FEIS, also pages 5-11 and 5-73 in the FEIS, there doesn't seem to be any snags retained in these areas. And, in fact, the quotation I just gave you indicates that there won't be any snags retained within those harvest units. And that's where a good portion of our concern comes from. These are essentially going to be mini-clear cuts out there, and there won't be sufficient habitat within those harvested units for wildlife. And that's what the Northwest Forest Plan requires, is to meet the standards and guidelines within the managed areas, i.e. the harvest units. So what I'd like to talk a little bit about is BLM's discussion about habitat suitability. And I know that this was an issue for the court on Monday. It's important to keep in mind that late succession reserves are designed to be a place where old growth habitat is created and exists on the landscape. And there are four major structural components of that old growth habitat, one of which being late or large diameter snags, which are exactly what this project is targeting. It's targeting those snags that are much greater than 16 inches in diameter. In fact, the average snag is 26 inches in diameter. And so when we talk about the late succession reserve objective, that objective is the development of snags. What the district court looked at, and what ONRC has argued, is that when you have a project that targets large diameter snags that are likely to persist on the landscape, you are fundamentally at odds with this late successional reserve objective of snag development. Now, this gets back to your question about, well, what kind of project would look reasonable to ONRC in this case? And, again, one option would be looking at Alternative C, which would have complied with the late successional reserve assessment standards and guidelines, but was rejected. In other words, are you saying that it was arbitrary and capricious of the BLM to reject Alternative C? Well, Your Honor, I must admit that we have to tread very carefully because we're not necessarily saying you should substitute your opinion for the agency's opinion. But you've got the burden here. You've got the burden. Right. But it would have been a reasonable alternative for them to select because it complied with the law. What we've argued is that Alternative G, the selective alternative, runs afoul of those very standards and guidelines that Alternative C, that the BLM acknowledges Alternative C would have actually complied with. But you could accept Alternative F or G. It's just that the alternative, you're arguing, as I understand it, selected was in violation of the law. Correct. And that gets to the second, perhaps, alternative that BLM could have done. Alternative C is one. The other is actually to run through what the standards and guidelines of the Northwest Forest Plan require. And think of these as screens that you have to kind of meet each one before you go on to the next step. That first step is late successional reserve objective of snag development. So if you are designing an alternative that did not interfere with snag development, for example, you remove the small trees, which BLM does not consider to be snag habitat. That would be one way. So assuming that you are consistent with that LSR objective of snag development, then you would have to evaluate whether or not your project decreased habitat suitability now or in the future. Now, in this case, what the BLM's analysis shows in the FEIS is that Alternative G actually reduces the habitat threshold from 80% pre-project to 30% post-project. So you're seeing a habitat suitability decline significantly as a result of this project. And that's immediately post-project. So we're looking at habitat suitability now. Now, in the future, you're not going to have the type of late successional habitat that we'd like to have in LSRs because you're removing the large trees now that are a fundamental component of late successional habitat. So these big trees that are going to persist on the landscape for decades are being removed in this project. They're not going to return or reappear on the landscape for decades. Removing them now means that you necessarily decrease or degrade habitat in the future. Since your time is running out, this, for me, I'd like to have you comment. You didn't comment much in recent about difference. Yes, ma'am. We can't find not only that, I mean, if we find we think they're wrong, that's one thing. But we also have to find that their actions were arbitrary. I mean, the ruling was arbitrary and capricious. Could you focus on that? Yes, I would be more than happy to do that. I think that there are two things to look at in the briefing of my opponents. One was that they were urging this court to give the Bureau of Land Management deference as well as the Regional Ecosystem Office deference. And I think it's important to keep in mind here that neither the Bureau of Land Management or the Regional Ecosystem Office or RIO actually gave any interpretation of what the Northwest Forest Plan says. Instead, what they did was they say, our project complies with the Northwest Forest Plan. And those are two very different things. Now, let me first focus on the type of deference dealing with agencies, the BLM in this particular case. I think that the first thing to note, again, is that this court in the United States, the Trident Seafood Corporation, 60 F. 3rd, 556, that's the Ninth Circuit from 1995, did indeed hold that no deference is due an agency where there's no official interpretation of whatever guideline or standard or regulation is at issue. In this case, we don't have any sort of official interpretation. All we have is BLM saying, Your Honor, you should agree with our project because we're the agency, not that we've looked at this Northwest Forest Plan standard and this is what we think it means and this is how our project complies with it. That sounds to me like you're asking for a de novo review. I mean, what's the alternative if we can't apply an arbitrary and capricious standard? Whatever it is they did, in effect, then you're asking us to reconsider what they did and decide whether we would have done it the same way or not. Well, I think that there are a couple of responses to that. And, you know, I think that this Court is guided by its obligations, independent obligation, to see whether or not the agency has complied with the law. And we believe in this case that the standards and guidelines of the Northwest Forest Plan are clear and that there is no reason for the BLM to be determining on a site-specific level whether or not it complied with those standards. For example, let me give you a practical... Well, isn't that an issue that has to be reviewed by the reviewing court? In effect, you're asking us to make that decision, are you not? I am asking this Court to determine whether or not the two timber sales challenges in this case are consistent with the Northwest Forest Plan standards and guidelines, rather than simply accepting BLM's proposal that we have to take it on faith  and in which case it would be sent back ordering them to comply. Is that right? Correct. All right. And, again, let's think about practical implications of this deference issue. The Northwest Forest Plan, it's a large regional plan. It covers three states, 19 national forests, seven BLM districts, six national parks, National Wildlife Refuges, and Department of Defense lands. So we've got a lot of agencies, a lot of lands that are being covered under the Northwest Forest Plan. But in allowing the BLM to interpret what the Northwest Forest Plan said, excuse me, permitting the Medford district of the BLM, allows one unit out of seven BLM districts, not to mention the national forests, wildlife refuges, et cetera, to actually set official policy. Now, how does this court, for example, rectify what the BLM says is okay for meeting Northwest Forest Plan standards with, for example, what the Forest Service said is okay in the Eyerly case that you heard on Monday? The two things that... And you don't think the arbitrary and capricious tool of analysis is adequate to that task? I do think it's adequate, but I think that this court needs to look further. The court needs to look to the record to determine whether or not the actual nature of the project is consistent with those standards and guidelines. And I think that the BLM is just asking the court to say, well, we're the scientists, you should just accept whatever we say, as opposed to actually looking deeper and looking at what the Northwest Forest Plan actually requires and seeing if the project is consistent with those standards and guidelines. So I think, and again, let's look for just one minute at the Regional Ecosystems Office determination... Give me an example of deference that you would feel appropriate. In other words, if it were the Assistant Secretary of Agriculture deciding that, yes, this sale did comply with the Northwest Forest Plan, you would defer in that case, but you would not defer to the ranger in Medford? I think that the issue is whether or not the agency as a whole has issued an interpretation of what the Northwest Forest Plan standards and guidelines specifically require. You know, is six snags per acre enough? Is two snags per acre enough? If the agencies came out with an official interpretation, according to my reading of this court's literature on deference, then I think that that would be okay. But in this case, we don't have an official interpretation. Would you have to have some sort of a detailed interpretation in advance of doing anything in the forest? Would you need to have one? I'm asking you, is that what you're saying? That until somebody determines that the forest plan requires, let's say, ten snags per acre, whatever the number is, until somebody decides that who has the power to speak with deference, until that happens, the resource agencies can't do anything? No, I don't think that's true. I think that what they can do, again, is look at the step-by-step that I laid out before, late succession reserve objectives, are you consistent with that? Are you developing snags or are you not? And then look to habitat suitability. Are you decreasing habitat suitability now in the future? If you're not doing that, then okay, let's go forward and develop a project based on the step-by-step consistency with all of those Northwest Forest Plan standards and guidelines. In this case, what we have at each step is the final environmental impact statement, basically saying we aren't doing any of those things. We're targeting large diameter snags for removal in this project. We're creating habitat conditions that are worse based on our actions than if we didn't do anything in this watershed, i.e. we're decreasing habitat suitability now and in the future. So I think that if there was a demonstration that each of those steps had been met or each of those standards had been met, then we might have an okay project that is therefore due deference based on agency scientific deference. So I think that based on that, and again, we addressed in our briefs the issue of whether or not the Regional Ecosystem Office is required or is due any deference. In that case, I think it's much more of a clear-cut situation. RIO is not an agency. It simply forms a staff function for another quasi-governmental working group. So we're not looking at any sort of deference due RIO's interpretation of whether or not this project is consistent with the Northwest Forest Plan. I want to touch just briefly on the issue, because my time is running out, on cumulative effects. I understand Mr. Horngren's intention or issue of private lands being off limits to cumulative impacts analysis because DLM had no ability to compel the private agency entity to give it information. But I think one of the important things to note, as we brought out in our brief, is that the issue is how the private land logging in a checkerboarded watershed affects those intermingled private or public lands. For example, there were five to seven miles of road constructed across private lands to reach, or excuse me, across public lands to reach private lands, but there's no analysis in the EIS anywhere of how that road construction in Lake Succession Reserve in a deferred watershed actually affected public resources. Thank you, Counselor. Your time has expired. Thank you. The case just argued will be submitted for decision, and the Court will adjourn.
judges: Browning, D.W. Nelson, O'Scannlain